## BOARD OF PUBLIC WORKS

**NATURAL RESOURCES – WATER RESOURCES – STATUTORY CONSTRUCTION – AUTHORITY TO LICENSE SMALL COVERINGS ON PIERS IN STATE AND PRIVATE WETLANDS**

August 6, 1993

*Ms. Sandra K. Reynold*
*Executive Secretary*
*Board of Public Works*

On behalf of the Board of Public Works, you have requested our opinion concerning the Board's authority to allow, in the words of your opinion request, "certain nominal structures to be erected on piers," in light of a statutory prohibition on the licensing of "a non-water dependent structure on a pier ...." Specifically, the Board's questions are as follows:

1.    May the Board, with respect to State wetlands, and the Department of Natural Resources, with respect to private wetlands, license the construction of coverings on piers not to exceed 200 square feet, so that piers may be improved for recreational uses and enjoyment?

2.    Would such a structure be "non-water dependent"?

For the reasons stated below, we conclude as follows:

1.    The Board of Public Works, with respect to State wetlands, and the Department of Natural Resources, with respect to private wetlands, may license the construction of a small covering on a pier only if the covering will result in no harm to the wetlands environment. Whether a small roofed construction like a gazebo, for example, is permissible depends on the Board's or the Department's evaluation of its effects under the applicable statutory criteria. The Board or the Department may not grant a regulatory exemption to an entire category of construction unless the Board or the Department is able to conclude, on the basis of its expertise applied to the rulemaking record, that no construction within the category would result in harm to the wetlands environment.

2.     A pier covering is "non-water dependent" whenever it has a purpose that could be served if the structure were located on land. A gazebo, for example, is "non-water dependent," because it provides functional cover wherever it is located.  That a structure would afford greater enjoyment to the owner were it located on a pier does not take the structure out of the class of "non-water dependent" structures.

# I

## Scope of Authority

### A.     Introduction

The Board of Public Works has only the authority granted to it by statute.  76 *Opinions of the Attorney General* 46, 49 (1991).  As a corollary, when the General Assembly has granted the Board of Public Works authority in an area, the Board must adhere to whatever limitations the General Assembly has imposed on the exercise of that authority.  "[I]t was the intention of the authors of the Constitution that the Board's power be circumscribed by the Legislature."  62 *Opinions of the Attorney General* 716, 727 (1977).  The same is true, of course, of the Department of Natural Resources: It may act only within the scope of its statutory authority and must adhere to any limitations on the exercise of that authority.  An administrative practice of the Board or the Department "is entitled to no weight where it is inconsistent with the statutory scheme." *Sugarloaf Citizens Ass'n v. Northeast Md. Waste Disposal Auth.,* 323 Md. 641, 663 n. 2, 594 A.2d 1115 (1991).

### B.     State Wetlands

Unless patented into private ownership prior to 1862, lands in Maryland below the mean high tide line, denominated "State wetlands" by §9-101(n) of the Natural Resources Article, Maryland Code ("NR" Article), are "held [by the State] for the benefit of the inhabitants of Maryland and this holding is of a general fiduciary character." *Kerpelman v. Board of Public Works,* 261 Md. 436, 445, 276 A.2d 56 (1971).  "[T]he right to build a wharf or other structure into the water can be derived only from a grant or permission of the State, because virtually all land under water belongs to the State." *People's Counsel v. Maryland Marine Manufacturing Co., Inc.*, 316 Md. 491, 502, 560 A.2d 32 (1989).  The State's proprietary interest

in State wetlands includes not only the submerged land itself, but also the water and air space above State wetlands. *See Caine v. Cantrell,* 279 Md. 392, 369 A.2d 56 (1977).[1]

The Board of Public Works, as agent for the State's proprietary interest in State wetlands and the water and air space above them, has authority to determine "whether to issue a license to dredge or fill State wetlands." NR §9-202(b). The grant of discretion to the Board in making its proprietary determination is a broad one: "[T]he Board shall decide if issuance of the license is in the best interest of the State, taking into account the varying ecological, economic, developmental, recreational, and aesthetic values each application presents."[2] Should the Board decide to issue the license, "the issuance of the license shall be ... on terms and conditions the Board determines." NR §9-202(c).[3] *See* 55 *Opinions of the Attorney General* 350 (1970) (approval of license entails exercise of Board's "judgment and discretion").[4] Thus, NR §9-202 grants exceedingly

---

[1] One aspect of this case involved the deck of a beach house that was cantilevered out into the air space across the mean high tide line. The Court of Appeals held that this structure was "clearly an encroachment upon the area between mean high water and mean low water, title to which is vested in the State of Maryland, and held for the benefit of the inhabitants of the State. 279 Md. at 399.

[2] "It is the public policy of the State, taking into account varying ecological, economic, developmental, recreational, and aesthetic values, to preserve the wetlands and prevent their despoliation and destruction." NR §9-102(b). These criteria are reiterated for State wetlands license decisions in NR §9-202(c) and for private wetlands permit decisions in NR §9-306(b).

[3] One such condition is that a licensed project not vary from that approved by the Board. Thus, a person who received a license for a pier may not change the configuration of the pier without Board approval.

[4] With respect to State wetlands, the statute provides the Secretary of Natural Resources with an advisory role to the Board's exercise of proprietary authority:

> The Secretary shall assist the Board in
> determining whether to issue a license to dredge
> or fill State wetlands. The Secretary shall submit

(continued...)

broad discretion to the Board in exercising the State's proprietary interest in State wetlands and the water and air spaces above them.

With the enactment of Chapter 794 of the Laws of Maryland 1989, now codified in relevant part at NR §9-104, the General Assembly imposed a limitation on the Board's otherwise broad discretion in granting State wetlands licenses.[5] NR §9-104 prohibits the Board, with certain exceptions that are not pertinent here, and "notwithstanding any other provision of law," from issuing a license "for any project involving the construction of a dwelling unit or other non-water dependent structure on a pier located on State wetlands." NR §9-104(b)(1).

## C.    *Private Wetlands*

Except to the extent that an activity is allowed by regulation, a person "proposing to conduct on any [private] wetland an activity ..." must obtain a permit from the Secretary of Natural Resources. NR §9-306(a).[6]  An "activity" would include "dredging, filling, removing, or otherwise altering or polluting private wetlands." NR §9-302(a).  Like the Board with respect to its proprietary decisions concerning State wetlands, the Secretary, in regulating activities on

---

[4] (...continued)
> a report indicating whether the license should be granted and, if so, the terms, conditions, and consideration required after consultation with any interested federal, state, and local unit, and after issuing public notice, holding any requested hearing, and taking any evidence the Secretary thinks advisable.

NR §9-202(b).

[5] Another limitation is set out in §§10-401 and 10-402 of the State Finance and Procurement Article, which limit the Board's authority to convey submerged lands to anyone other than an adjacent riparian owner.

[6] The term "private wetlands" is defined in NR §9-101(j); the term "activity" is not defined.  As the name implies, private wetlands are private real property, and the Secretary's actions in issuing or denying permits to dredge or fill private wetlands are regulatory, under the State's police power, in contrast to the proprietary actions of the Board of Public Works in granting or denying applications for State wetlands licenses.

private wetlands, is to consider a range of factors in evaluating an application and "may impose conditions or limitations designed to carry out the public policy set forth in this title." NR §9-306(b).[7]

Chapter 794 imposed the same restriction on the Secretary's regulatory actions as on the Board's proprietary decisions. With exceptions not pertinent here, and "notwithstanding any other provision of law, the Secretary may not issue a permit under this title for any project involving the construction of a dwelling unit or other non-water dependent structure on a pier located on private wetlands." NR §9-104(c)(1).[8]

### D.   *Proposed Regulatory Exemption*

In regulations proposed several months ago, the Department stated that it would generally "reject applications for structures on piers." Proposed COMAR 08.05.05.15A, 20:2 Md. Reg. 140 (Jan. 22, 193).[9]  The regulation then went on to list "categories of structures" that were to be "exempt from the regulation" − that is, structures for which a permit application would be considered. One exempt category was:

> A structure on a noncommercial pier with a roof or cover meeting the following criteria:
>
> (a) A footprint not to exceed 200 square feet,

---

[7] *See* note 2 above for the General Assembly's statement of public policy.

[8] Chapter 794 also imposed the same restriction on regulatory actions by local government officials by means of an amendment to the Chesapeake Bay Critical Area Law.  *See* NR §8-1808.4(e)(1).

[9] Parallel regulations proposed by the Board of Public Works would delegate certain approval and rejection authority to the Department, including piers and structures on piers.  Proposed COMAR 23.02.04.04, 20:20 Md. Reg. 168 (Jan. 22, 1993).

(b) A maximum height not to exceed 12
feet from the surface of the pier deck, and

(c) No permanent or temporary walls
except for screening.

The Chesapeake Bay Critical Area Commission objected to this and other exemptions, believing them to be inconsistent with NR §8-1808.4(e)(1), the Critical Area Law counterpart to NR §9-104. Letter from John C. North, II, Chairman, to Mr. Frank W. Dawson, Chief of the Tidal Wetlands Division (March 5, 1993). In a subsequent letter of advice, Assistant Attorney General Judith F. Plymyer concluded that the Department lacked "clear authority ... to exempt certain non-water dependent structures on piers by means of its regulations ...." Letter to Delegate Kenneth H. Masters at 4 (April 16, 1993).

## II

## Construing Chapter 794

### A.   *Underlying Principles*

The purpose of statutory construction is to understand the objective that the Legislature sought to achieve and to apply the statutory text in a way that serves this objective. *See Kaczorowski v. City of Baltimore,* 309 Md. 505, 515-16, 525 A.2d 628 (1987). The text is the primary, but not the exclusive, means for ascertaining the legislative objective:

> When we look at the statutory language we apply the plain meaning of the words chosen by the Legislature.... If the statutory language itself is insufficient to lead us comfortably to conclude what the Legislature intended, we look beyond the words and examine the legislative history when it is available and the context of the legislation.

*Leppo v. State Highway Administration,* 330 Md. 416, 422, 624 A.2d 539 (1993) (citations omitted).

Sometimes, despite a canvass of all potential sources from which to derive legislative intent, a definitive answer about the import of statutory language cannot be given.  In that event, any reasonable interpretation by the agency responsible for administering the statute, if adopted through proper procedures, would be determinative.  *See generally* 76 *Opinions of the Attorney General* 3 (1991) (occupational licensing board "has presumed expertise and ... responsibility" to determine specific application of statutory term, the scope of which was not clearly delineated by the General Assembly).

In this instance, we shall consider plain meaning, legislative history, and context in seeking an understanding of the General Assembly's intent in using the term "non-water dependent structure."

### B.    *"Non-Water Dependent"*

The term "non-water dependent" is not defined in the statute, nor is it explained in the legislative history.  The Bill Analysis for House Bill 156 does give one example of a "water dependent" use − a marina.

The term "water dependent," however, is explained in statute and defined in regulation.  The statute authorizing the Department of Natural Resources to regulate nontidal wetlands refers to an activity that "[i]s water dependent and requires access to the nontidal wetland as a central element of its basic function."  NR §8-1207(a)(1).  Similarly, the term "water dependent activity" is defined in the Department's nontidal wetlands regulations to mean "an activity for which the use of surface water would be essential to fulfill a basic purpose of the proposed project."  COMAR 08.05.04.01B(88).  Finally, the regulations of the Chesapeake Bay Critical Area Commission define "water-dependent facilities" as "those structures or works associated with industrial, maritime, recreational, educational, or fisheries activities that require location at or near the shoreline ....  An activity is water-dependent if it cannot exist outside of the [100-foot shoreline] Buffer and is dependent on the water by reason of the intrinsic nature of its operation."  COMAR 27.01.03.01A and B.  *Accord*, *Mein v. San Francisco Bay Cons. and Dev. Comm'n,* 218 Cal. App. 3d 727, 267

Cal. Rptr. 252, 255 (1990) ("water-oriented uses" are those that are "functionally dependent on proximity to the water").

Without any indication that the General Assembly intended a different usage, we give the term "non-water dependent" the meaning derived from these elements of existing law.[10] "It is presumed that the General Assembly acted with full knowledge of prior legislation and intended statutes that affect the same subject matter to blend into a consistent and harmonious body of law." *State v. Bricker,* 321 Md. 86, 93, 581 A.2d 9 (1990).

If built merely to enhance the property owner's enjoyment of a water view, a covered structure like a gazebo would be "non-water dependent." That purpose – providing shelter to make the vantage on the water more enjoyable – could be achieved (albeit perhaps not quite as well) from land. On the other hand, we cannot rule out the possibility that perhaps some covered structures are so integrally a part of water use as to be water dependent and therefore outside the prohibition in NR §9-104.

The Board and the Secretary have been delegated the authority "to determine specific questions of fact" of this kind. *Department of Natural Resources v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 223, 334 A.2d 514 (1975). They have the expertise to evaluate a particular permit application to judge whether or not the project in question is "non-water dependent." If it is non-water dependent, in the sense that it could serve a purpose even if it were located somewhere else, and it is a "structure" (an issue addressed below), then the Board or the Secretary may not permit it.

## C. *"Structures"*

Is a small covering on a pier for purposes of recreational use and enjoyment a "structure"? The term is undefined in the statute, and the legislative history does not convey a clear picture of what the Legislature intended when it used the term "structure."

---

[10] The Department's proposed tidal wetlands regulations defined "non-water-dependent structure or activity" to mean a structure or activity "which by reason of its intrinsic nature or operation does not require location in or over State or private tidal wetlands." Proposed COMAR 08.05.05.02.B(36).

Chapter 794 originated as cross-filed bills, House Bill 156 and Senate Bill 191, the short title of which was "Pier Housing — Prohibition." The bill's title stated that it was for the purpose of "prohibiting the issuance of certain permits or licenses for the construction of a dwelling unit located on a pier," and the pertinent substantive language provided that, "[n]otwithstanding any other provision of law, the Board of Public Works may not issue a license under this title for any project involving the construction of a dwelling unit on a pier located on State wetlands." The same restriction applied to the Department as to private wetlands.

The bill was amended in committee in several respects, mainly to create certain exceptions to the prohibition that are not relevant to this analysis. But one amendment added the crucial language. At the suggestion of the Department of Natural Resources, the prohibitory language was expanded to encompass not only dwelling units but also "other non-water dependent structure[s]." The language that now appears in NR §9-104(b)(1) and (c)(1) was the result of this amendment.[11] Although the committees accepted the amendment, none of the materials prepared by the committees contain any elaboration or explanation of it.

The Department proposed the amendment because of the "[s]ignificant issues raised by housing *and other non-water dependent commercial development* (e.g., restaurants, office space) on piers ...." Water Resources Administration Bill Report on Senate Bill 191, at 1 (March 13, 1989) (emphasis added). This description suggests that the Department, when it proposed the language "or other non-water dependent structure[s]," intended the phrase to apply to comparatively large-scale structures, equivalent to dwelling units in their effect on the State's varying interests in State and private wetlands.[12]

---

[11] The title of the bill was amended to state that its purpose was now "prohibiting the issuance of certain permits or licenses for the construction of a dwelling unit or other non-water dependent structure located on a pier."

[12] A rule of statutory construction known by the Latin tag *ejusdem generis* would lead to the same conclusion – that the general phrase "or other non-water-dependent structure" should be construed to refer only to

(continued...)

On the other hand, the same departmental bill report referred to the proposed amendment as "extending the prohibition to *all* non-water dependent uses." Bill Report at 2 (emphasis added). One of the opponents of the bill, the Greater Baltimore Board of Realtors, understood the amendment to be quite expansive: "The bill should only be limited to pier housing and *not* be extended to *all* pier structures as proposed in [the] amendment." Letter from Joseph McGraw, Director of Government Relations, to Delegate John S. Arnick, Chairman of the House Environmental Matters Committee (March 1, 1989) (emphasis in original).

Generally speaking, the term "structure" is "one of the broadest words in the English language and is very comprehensive." *United States ex rel. Murphy v. Warden,* 29 F. Supp. 486, 492 (N.D.N.Y. 1939). In its broadest sense, the word refers to "any product or piece of work artificially built up or composed of parts and joined together in some definite manner." *Watson Industries v. Shaw*, 235 N.C. 203, 69 S.E. 2d 505, 509 (1952). Standard dictionaries illustrate the potential breadth of the term. *See Black's Law Dictionary* 1424 (6th ed. 1990) ("That which is built or constructed; an edifice or building of any kind."); *Random House Dictionary of the English Language* 1887 (2d ed. 1987) ("something built or constructed"). Citing the broad dictionary definition, the Court of Special Appeals concluded that an above-ground swimming pool was a "structure" within the meaning of that term in a restrictive covenant. *Lindner v. Woytowitz*, 37 Md. App. 652, 657-58, 378 A.2d 212 (1977).

Other cases, however, do not necessarily apply the dictionary definition so literally. The Court of Appeals, for example, suggested that a fence and a light standard were not "structures" within the meaning of that term in a restrictive covenant. *Chertkof v. Spector*

---

[12] (...continued)
structures of the same type as a dwelling. See 2A Sutherland, *Statutory Construction* §47.17 (5th ed. 1992). The Court of Appeals, however, has recently eschewed the rote invocation of rules of construction like this one. The Court has pointed out, moreover, that the rule must in any event yield to other indications of legislative intent: "[T]he general words will not be restricted in meaning if upon a consideration of the context and the purpose of the particular statutory provisions as a whole it is clear that the general words were not used in the restrictive sense." *Department of Assessments and Taxation v. Belcher*, 315 Md. 111, 121, 553 A.2d 691 (1989).

*Baltimore Terminal Corp., Inc.,* 263 Md. 550, 559, 284 A.2d 215 (1971). *Compare Stewart v. Walsh,* 178 S.W.2d 506, 508 (Tex. 1944) (a fence is a structure within the meaning of a restrictive covenant) *with Keller v. Branton,* 667 P.2d 650, 653 (Wyo. 1983) (a fence is not a structure within the meaning of a restrictive covenant). *Compare also State v. Baggett,* 292 So. 2d 201, 203 (La. 1974) (a fenced carport is a structure within the meaning of a burglary statute) *with Day v. State*, 534 S.W.2d 681, 686 (Tex. Crim. App. 1976) (an open-ended storage shed, like a carport, is not a structure within the meaning of a burglary statute).

The case nearest on point, from Maine, involved a municipal zoning ordinance requiring a 75-foot set back from the normal high water mark "for all structures."  In *Inhabitants of Town of Boothbay v. Russell*, 410 A.2d 554 (Me. 1980), a landowner argued that a "picnic deck" intended to be built within 75 feet of the shore was not a "structure."  The Maine Supreme Court "quickly dispose[d]" of this contention:

> The deck — a platform 24 x 27 feet in size, enclosed by a wooden railing, constructed of $1,000 worth of lumber and other materials, and anchored to the land by concrete — obviously comes within the intendment of the ordinance that prohibits, with limited exceptions not here pertinent, "all structures" within 75 feet of the normal high water mark. To hold that a substantial deck, permanently affixed to the land and costing about $2,500 to construct, is not a "structure" would fly in the face of the common everyday meaning of the term.

410 A.2d at 557.  To hold otherwise, the Maine court continued, would be inconsistent with the "purposes of shoreland zoning."  *Id*.

Likewise, the General Assembly's use of the term "structure" should be related to the purposes underlying NR §9-104.  The principal sponsor of the bill wrote that "[t]he unqualified construction of non-water dependent structures on piers around the State would inevitably lead to further pollution of the Bay at a time when we are spending millions to clean it up.  The destruction of

wetlands, as well as shore erosion, and added run-off are only a few of the potential detriments. Additionally, allowing non-water dependent structures to be built on public land will cut off and preclude many citizens from accessing Maryland's waterways." Letter from Delegate John S. Arnick to Senator Clarence W. Blount, Chairman of the Economic and Environmental Affairs Committee (March 29, 1989).

As the Department suggested when it proposed the language in question, some commercial or similar structures would have as detrimental effect as a dwelling on the State and private wetlands that the Board and Secretary are to safeguard. Indeed, we can suppose that even a smaller roofed structure might result in perceptible environmental harms, given the fragility of the wetlands environment and such factors as the pattern of shade and precipitation run-off.

In the end, the scope of the term "structure" cannot be precisely fixed as a matter of law; its outer boundaries are matters of "legislative fact" that require expert evaluation. *See* 76 *Opinions of the Attorney General* 3, 14 (1991) (resolution of issue whether particular treatment procedures fall within statutory scope of practice provision "calls for technical expertise in assessing 'legislative facts'").[13] When a statutory term is "vague" and not "susceptible of only one interpretation ...," that term's "presence in an administrative statute ... suggests that the General Assembly intended to entrust the formulation of specific standards to the technical expertise of those charged with enforcing the statute." *Baltimore Gas & Electric Co. v. Public Service Commission*, 305 Md. 145, 159, 501 A.2d 1307 (1986). *Cf. Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844 (1984). In short, the Board and the Secretary have discretion to conclude that a piece of construction is not a "structure," if the end result will have none of the negative effects that animated the passage of the legislation.

The authority of the Board and the Secretary to conclude that a piece of construction would have so little effect on the wetlands

---

[13] "Legislative facts ... are the general facts which help the tribunal decide questions of law and policy and discretion." 2 K.C. Davis, *Administrative Law Treatise* §12:3, at 413 (1979).

environment as to fall short of being a "structure" may also be understood as an application of the "*de minimis* doctrine." Drawn from the common law maxim *de minimis non curat lex* − the law does not take account of trifling matters − the doctrine allows insignificant deviations from a legal standard to be excused.

Despite the common law origin of the maxim, it has potential application in the enforcement of statutes. In *Capital Transit Co. v. Bosley*, 191 Md. 502, 514, 62 A.2d 267 (1948), for example, the Court of Appeals noted that the "doctrine *de minimis*" would be applicable to compliance with a statute prescribing standards for public transport rates. The doctrine's role in statutory enforcement was explained by a commentator as follows:

> [A court] is not bound to a strictness at once harsh and pedantic in the application of statutes. The law permits the qualification implied in the ancient maxim, *de minimis non curat lex* .... If the deviation were a mere trifle, which, if continued in practice, would weigh little or nothing on the public interest, it might properly be overlooked.

H. Bloom, *Legal Maxims* 90 (10th ed. 1939) (citation omitted). *See Bristol-Myers Co. v. Lit Bros.*, 356 Pa. 81, 6 A.2d 843, 848 (1939) (quoting this passage from Bloom in refusing relief for violation of fair trade act having only "trifling" economic consequences).

Examples nearer to the issue posed by your inquiry may be drawn from zoning variance cases. In *Pyzdrowski v. Board of Adj.*, 437 Pa. 481, 263 A.2d 426 (1970), for example, a zoning ordinance required a ten-foot side yard setback. A landowner subdivided a 100-foot wide tract despite the fact that an existing structure was 9.3 feet from the new side boundary line. The court affirmed the decision of the administrative agency allowing the variance: "Although the hardship was self-created in this case, the spirit of the ordinance was observed by permitting only a minimal deviation from the side yard requirements ...." 263 A.2d at 432. The general principle was stated as follows by another Pennsylvania court: "De minimis applies where only a minor deviation from the zoning ordinance is sought and rigid compliance is not necessary to protect

the ordinance's public policy concerns." *Chacona v. Zoning Bd of Adj.* 599 A.2d 255, 259 (Pa. Cmwlth. 1991).

If the Board and the Department, either case-by-case or by regulatory category, articulate a reasonable basis for concluding that a small construction project will have none of the harms that are the public policy concerns of Chapter 794, they may permit the construction.

## IV

## Conclusion

In summary, it is our opinion that the Board of Public Works and the Secretary of Natural Resources may not grant a permit for a "non-water dependent structure" of any kind, whether large or small, on a pier in State or private wetlands. The Board and the Secretary do have the authority, however, to determine whether particular construction projects, including small-scale coverings, are either water-dependent or so insignificant in terms of the public policy concerns of Chapter 794 as to be outside the term "structure," and therefore to be permissible.[14]

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*

---

[14] We suggest that the legislative objective of Chapter 794 would best be served if the Board of Public Works, the Secretary, and the Chesapeake Bay Critical Area Commission agreed on common terminology in their regulations for referring to construction activities that are permissible.